# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

RECEIVED
CHARLOTTE, N.C.

SEP 30 2009

Clerk, U.S. Dist. Court
W. Dist. of N.C.

CASE # ___3.09cv423___

**NOTICE OF REMOVAL**
**FROM STATE TO FEDERAL**
State Case ID # 09 SP 005583

**MOTION FOR WRIT OF CERTIORARI**
**SEQUESTER**
**MOTION TO MOVE FOR SUMMARY SETOFF/ DISCHARGE**
**IN FAVOR OF THE GRANTOR, SETTLOR**

| | |
|---|---|
| IN THE MATTER OF | } **WRIT IN THE NATURE OF DISCOVERY** |
| | } |
| Kiya Nebet Bey | } **REQUEST FOR DEBT VALIDATION ASSESSMENT** |
| **Ex Rel [BERNADETTE ERVIN]** | } |
| | } |
| | } |

COMES NOW:
The Petitioner, **Kiya Nebet Bey**, Beneficiary,Bailor, **living, flesh and blood secured party** and Hakum Musta El Bey, Trustee, for Bernadette Demetra Georges, Ervin, Grantor - in the matter of EX Rel [BERNADETTE ERVIN], pursuant 27 CFR 72.11
**TILA Rescission 12 CFR 226.23 Appendix H**
        **National Currancy Act (1872, 1874) sec. 27,28,53**
        **HJR 192 73rd Cong. 1st Sess. June 5, 1933**
        **Uniform Commercial Codes 3-601 thru 604**
        **CFR TITLE 18 Sec 655-656**
does hereby request a validation of debt regarding the above styled case with attached presentments from CLERK OF SUPERIOR COURT SPECIAL PROCEEDING FOR AGENT: Brock & Scott, PLLC, MERS, Mortgage Electronic Registration

Prepared and submitted this day of **September 29, 2009**

By: _Kiya Nebet Bey_

        **Kiya Nebet Bey**
        Authorized Representative
        Nonresident/ Non-Domestic
        First Class, U.S. Delivery
        Care of 17313 Knoxwood Drive
        Huntersville, North Carolina Republic state

Systems, Inc, BANK OF AMERICA, COUNTRYWIDE, Stewart Title Company, First Magnus Financial Corporation "et al"

## Cause of Removal:

Alan Smith of the Clerk's office of the state, unjustly closed out a hearing held on 09/15/2009 without due justice to the information submitted, **and did not give consideration to the tender of payment that had been given,** nor did he acknowledge the various other violations that were submitted into the case. Such as listed below:

<u>Violations of:</u> **TILA Rescission 12 CFR 226.23 Appendix H**
**National Currancy Act (1872, 1874) sec. 27,28,53**
**HJR 192 73rd Cong. 1st Sess. June 5, 1933**
**Uniform Commercial Codes 3-601 thru 604**
**CFR TITLE 18 Sec 655-656**

**Acts of Fraud, embezzlement, misapplication, and unconscionable contracts.**

## Landmark Ruling

RE:  Sept. 19 2009
Ellen Brown

A landmark ruling in a recent Kansas Supreme Court case may have given millions of distressed homeowners the legal wedge they need to avoid foreclosure. In *Landmark National Bank v. Kesler*, 2009 Kan. LEXIS 834, the Kansas Supreme Court held that a nominee company called MERS has no right or standing to bring an action for foreclosure. MERS is an acronym for Mortgage Electronic Registration Systems, a private company that registers mortgages electronically and tracks changes in ownership. The significance of the holding is that if MERS has no standing to foreclose, then *nobody* has standing to foreclose – on *60 million mortgages*. That is the number of American mortgages currently reported to be held by MERS. Over half of all new U.S. residential mortgage loans are registered with MERS and recorded in its name. Holdings of the Kansas Supreme Court are not binding on the rest of the country, but they are dicta of which other courts take note; and the reasoning behind the decision is sound.
Eliminating the "Straw Man" Shielding Lenders and Investors from Liability

The development of "electronic" mortgages managed by MERS went hand in hand with the "securitization" of mortgage loans – chopping them into pieces and selling them off to investors. In the heyday of mortgage securitizations, before investors got wise to their risks, lenders would slice up loans, bundle them into "financial products" called **"collateralized debt obligations"** (CDOs), ostensibly insure them against default by wrapping them in derivatives

Case 3:09-cv-00423-RLY-DCR   Document 2   Filed 09/30/09   Page 2 of 6

called "credit default swaps," and sell them to pension funds, municipal funds, foreign investment funds, and so forth. There were many secured parties, and the pieces kept changing hands; but MERS supposedly kept track of all these changes electronically. MERS would register and record mortgage loans in its name, and it would bring foreclosure actions in its name. MERS not only facilitated the rapid turnover of mortgages and mortgage-backed securities, but it has served as a sort of "corporate shield" that protects investors from claims by borrowers concerning predatory lending practices. California attorney Timothy McCandless describes the problem like this:

"[MERS] has reduced transparency in the mortgage market in two ways. First, consumers and their counsel can no longer turn to the public recording systems to learn the identity of the holder of their note. **Today, county recording systems are increasingly full of one meaningless name, MERS, repeated over and over again. But more importantly, all across the country, MERS now brings foreclosure proceedings in its own name – even though it is not the financial party in interest.** This is problematic because MERS is not prepared for or equipped to provide responses to consumers' discovery requests with respect to predatory lending claims and defenses. In effect, the securitization conduit attempts to use a faceless and seemingly innocent proxy with no knowledge of predatory origination or servicing behavior to do the dirty work of seizing the consumer's home. . . . So imposing is this opaque corporate wall, that in a "vast" number of foreclosures, MERS actually succeeds in foreclosing without producing the original note – the legal sine qua non of foreclosure – much less documentation that could support predatory lending defenses."

The real parties in interest concealed behind MERS have been made so faceless, however, that there is now no party with standing to foreclose. The Kansas Supreme Court stated that MERS' relationship "is more akin to that of a straw man than to a party possessing all the rights given a buyer." The court opined:

"By statute, assignment of the mortgage carries with it the assignment of the debt. . . . Indeed, in the event that a mortgage loan somehow separates interests of the note and the deed of trust, with the deed of trust lying with some independent entity, the mortgage may become unenforceable. *The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose, unless the holder of the deed of trust is the agent of the holder of the note. Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust.*" [Citations omitted; emphasis added.]

MERS as straw man lacks standing to foreclose, but so does original lender, although it was a signatory to the deal. The lender lacks standing because title had to pass to the secured parties for the arrangement to legally qualify as a "security." The lender has been paid in full and has no further legal interest in the claim. Only the securities holders have skin in the game; but they have no standing to foreclose, because they were not signatories to the original agreement. They cannot satisfy the basic requirement of contract law that a plaintiff suing on a written contract must produce a signed contract proving he is entitled to relief.

# The Potential Impact of 60 Million Fatally Flawed Mortgages

The banks arranging these mortgage-backed securities have typically served as trustees for the investors. When the trustees could not present timely written proof of ownership entitling them to foreclose, they would in the past file "lost-note affidavits" with the court; and judges usually let these foreclosures proceed without objection. But in October 2007, an intrepid federal judge in Cleveland put a halt to the practice. U.S. District Court Judge Christopher Boyko ruled that Deutsche Bank had not filed the proper paperwork to establish its right to foreclose on fourteen homes it was suing to repossess as trustee. Judges in many other states then came out with similar rulings.

Following the Boyko decision, in December 2007 attorney Sean Olender suggested in an article in *The San Francisco Chronicle* that the real reason for the bailout schemes being proposed by then-Treasury Secretary Henry Paulson was not to keep strapped borrowers in their homes so much as to stave off a spate of lawsuits against the banks. Olender wrote:

"The sole goal of the [bailout schemes] is to prevent owners of mortgage-backed securities, many of them foreigners, from suing U.S. banks and forcing them to buy back worthless mortgage securities at face value – right now almost 10 times their market worth. The ticking time bomb in the U.S. banking system is not resetting subprime mortgage rates. The real problem is the contractual ability of investors in mortgage bonds to require banks to buy back the loans at face value if there was fraud in the origination process.

". . . The catastrophic consequences of bond investors forcing originators to buy back loans at face value are beyond the current media discussion. *The loans at issue dwarf the capital available at the largest U.S. banks combined, and investor lawsuits would raise stunning liability sufficient to cause even the largest U.S. banks to fail, resulting in massive taxpayer-funded bailouts of Fannie and Freddie, and even FDIC . . . .*

"What would be prudent and logical is for the banks that sold this toxic waste to buy it back and for a lot of people to go to prison. If they knew about the fraud, they should have to buy the bonds back."

Needless to say, however, the banks did not buy back their toxic waste, and no bank officials went to jail. As Olender predicted, in the fall of 2008, massive taxpayer-funded bailouts of Fannie and Freddie were pushed through by Henry Paulson, whose former firm Goldman Sachs was an active player in creating CDOs when he was at its helm as CEO. Paulson also hastily engineered the $85 billion bailout of insurer American International Group (AIG), a major counterparty to Goldmans' massive holdings of CDOs. The insolvency of AIG was a huge crisis for Goldman, a principal beneficiary of the AIG bailout.

In a December 2007 *New York Times* article titled "The Long and Short of It at Goldman Sachs," Ben Stein wrote:

"For decades now, . . . I have been receiving letters [warning] me about the dangers of a secret government running the world . . . . [T]he closest I have recently seen to such a world-running body would have to be a certain large investment bank, whose alums are routinely Treasury secretaries, high advisers to presidents, and occasionally a governor or United States senator."

The pirates seem to have captured the ship, and until now there has been no one to stop them. But 60 million mortgages with fatal defects in title could give aggrieved homeowners and securities holders the crowbar they need to exert some serious leverage on Congress – serious enough perhaps even to pry the legislature loose from the powerful banking lobbies that now hold it in thrall.

Ellen Brown developed her research skills as an attorney practicing civil litigation in Los Angeles. In Web of Debt, her latest book, she turns those skills to an analysis of the Federal Reserve and "the money trust." She shows how this private cartel has usurped the power to create money from the people themselves, and how we the people can get it back. Her earlier books focused on the pharmaceutical cartel that gets its power from "the money trust." Her eleven books include Forbidden Medicine, Nature's Pharmacy (co-authored with Dr. Lynne Walker), and The Key to Ultimate Health (co-authored with Dr. Richard Hansen). Her websites are www.webofdebt.com and www.ellenbrown.com.

I demand that all decision-makers be present whether they are parties or not.

I demand that all wet ink original contracts that I'm alleged to sign be presented at appeal.

I also demand the original wet ink signature "Promissory Note" be available at such time.

(Which under 15 U.S.C 78 (c) section 10 deems to be a security, The life span of a promissory note cannot exceed nine months) This was never disclosed to me and is a fraud contract. There is not statute of limitations on Fraud.

### All PARTIES SERVED

Brock & Scott, PLLC
5431 Oleander Drive, Suite 200
Wilmington, NC 28403

First Magnus Financial Corporation
603 N. Wilmont
Tucson, AZ 85711

MERS (Mortgage Electronic Registration Systems, Inc)
1818 Library St. Suite 300
Riston, VA 20190

BANK OF AMERICA
7105 Corporate Drive
Plano, TX 75024-4100

COUNTRYWIDE
PO Box 660694
Dallas, TX 75266-0694

Stewart Title Guarantee Company
10115 Kincey Ave
Huntersville, NC 28078

On September 28, 2009 Bernadette Demetra Georges, Ervin, Personally appeared before

me, _____Akera El_____, a notary public **North Carolina** State **Mecklenburg** County.

_____Akera El_____
Notary Print Name

_____Akera El_____
Notary Signature

My commission expires __10/29/2012__

Notary Seal

# FORM

## CERTIFICATE OF SERVICE

**I hereby certify that a copy of the forgoing "Notice OF REMOVAL FROM STATE TO FEDERAL" was mailed to:**

Brock & Scott, PLLC

5431 Oleander Drive, Suite 200

Wilmington, NC 28403

First Magnus Financial Corporation

603 N. Wilmont

Tucson, AZ 85711

MERS (Mortgage Electronic Registration Systems, Inc)

1818 Library St. Suite 300

Riston, VA 20190

BANK OF AMERICA

7105 Corporate Drive

Plano, TX 75024-4100

COUNTRYWIDE

PO Box 660694

Dallas, TX 75266-0694

Stewart Title Guarantee Company

10115 Kincey Ave

Huntersville, NC 28078

*Kiya Nebet Bey*

Kiya Nebet Bey

Authorized Representative